# EXHIBIT B

================================================================

# MICHAEL TOSCHI, TRACY TOSCHI VS. COUNTY OF SAN MATEO, ETC.

## DEPOSITION OF MARK MARELICH

March 3, 2008

(Pages 1 - 228)

================================================================

**CONDENSED TRANSCRIPT AND CONCORDANCE**
**PREPARED BY:**

*A. MAGGI SAUNDERS & ASSOCIATES*
*Certified Shorthand Reporters*
*57 Plymouth Avenue*
*Mill Valley, CA 94941*
*Phone: (415) 383-6281*

## Page 165

1 the project, so I didn't hear who was telling who to do
2 what. I was a ways away, so I didn't -- I don't know
3 who directed what.
4     Q. Do you know who had the authority to make
5 that decision, to end that swale approximately 4 feet
6 from the edge of Plaintiffs' property line?
7     A. If the Road Manager was there, it probably
8 would have been him, but you'd have to ask him.
9     Q. And that's Mr. --
10     A. Imamura.
11     Q. Okay. And would anyone, other than Mr.
12 Imamura, have had the authority to direct the crew
13 regarding when to, or at what point to end where the
14 newly-paved asphalt swale was being put in?
15     A. Well, I don't think it would have been
16 Lisa directing the crews, because that's not her -- you
17 know, she doesn't direct the crews.
18         If Tsutomu wasn't there, it may have been
19 Joe Costa; but, I wasn't there, so I -- I mean, I
20 wasn't listening to who was telling what.
21     Q. But it wasn't you?
22     A. It wasn't me, no.
23     Q. So I'd have to ask Mr. Costa?
24     A. Yes.
25     Q. And he should know?

## Page 166

1     A. I would assume so.
2     Q. All right. Did you ever hear any
3 conversations on December 4th regarding the
4 construction of the newly-paved asphalt swale in that
5 vicinity?
6     A. No. I was -- Again, I was pretty --
7 pretty far away, watching.
8     Q. And in your Declaration, it says that:
9         "This gap was left in order not to alter
10         the historic flow of surface water
11         downhill to the Plaintiffs' property."
12         Do you see that, the top of page five of
13 your Declaration?
14     A. Yes.
15     Q. And why do you believe that this gap was
16 left, in order not to alter the historic flow of
17 surface water downhill to Plaintiffs' property?
18     A. We did not touch that area where the water
19 ran off. We paved or patched the potholes in the swale
20 area, and stopped where the asphalt stopped before; so,
21 we did not do any pavement beyond where there was
22 originally asphalt.
23     Q. Is it your testimony that the new pavement
24 was only put in where there originally had been
25 asphalt?

## Page 167

1     A. Yes. Yes, the pavement was patched where
2 there was asphalt, yes.
3     Q. And before that tree came out, do you know
4 if there was asphalt in that four to five-foot area?
5     A. I don't remember asphalt there, no.
6 That's where the water had run off, and it was a flat
7 area, so I don't remember asphalt there, no.
8     Q. And do you know when that road was last --
9         Well, when the road was originally
10 asphalted, is it your understanding that it was
11 asphalted, except for that four-foot area?
12     A. I don't know, because it was asphalted
13 before I became an inspector out there. And I'd even
14 have to check to see if it's even asphalted; might be a
15 rock road that's been oiled and then patched with
16 cutback over the years, as most of the roads up in
17 Emerald Hills are.
18     Q. Do you know if that road was initially
19 designed so water would drain onto that four-foot area?
20     A. I don't know.
21     Q. And do you know if there is erosion down
22 the hill from that four-foot area consistent with water
23 draining there for several years?
24     A. I've never been down there.
25     Q. Now, why do you believe, or why did you

## Page 168

1 state in your Declaration:
2         "The gap was left in order not to alter
3         the historic flow of surface water
4         downhill."
5         Did someone tell you that, that the gap
6 was left for that purpose?
7     A. The -- There was a gap there, or a low
8 point there, where the water ran off.
9     Q. Well, I'm referring to your Declaration,
10 top of page five, it says:
11         "The gap was left there" -- I'm sorry.
12         "The gap was left in order not to alter
13         the historic flow of surface water."
14         Do you see that?
15     A. Yes.
16     Q. And you've declared that under penalty of
17 perjury, correct?
18     A. Yes.
19     Q. And, but you don't know why the crew left
20 the gap there, or you do know why the crew left the gap
21 there?
22     A. Well, it's my understanding that it was --
23 we were not going to change the drainage pattern: If
24 we had patched that, it would have changed the drainage
25 pattern.

**Page 169**

1 Q. Who told you that?
2 A. That's what Lisa and I discussed: That,
3 you know, we shouldn't change the drainage pattern. If
4 you asphalted and raised it up, it would change the
5 drainage pattern. It should go the way it went before.
6 Q. And did you discuss that with Joe Costa?
7 A. I doubt it, because I'm not his
8 supervisor; I don't tell him what to do.
9 Q. So you discussed it with Mr. Imamura?
10 A. More than likely, it was with Lisa.
11 Q. Do you know if she discussed it with Mr.
12 Imamura?
13 A. You will have to ask her.
14 Q. I will. But you don't know?
15 A. I don't know.
16 Q. But you told Lisa that you thought that
17 the pavement should only go to that gap, and not any
18 further, so as not to disturb the historic flow of the
19 water?
20 A. I wasn't even involved in the patching,
21 or -- I was -- It was not my suggestion nor to tell
22 anybody that we should patch this. That was -- came
23 from somewhere else, not me.
24 Q. Well, then, how do you know that the gap
25 was left in order not to alter the historic flow of

**Page 170**

1 water, if you had nothing to do with it?
2 A. I had nothing to do with what was done. I
3 know what was out there.
4 Q. No, I understand that. I'm not trying to
5 nitpick with you, but your Declaration declares that:
6     "The gap was left in order not to alter
7     the historic flow of surface water."
8 A. Mm-hmm.
9 Q. However, you've told me that you don't
10 know who made the decision to leave that gap, or why.
11 A. Yeah, I declared that that happened, but
12 I -- I'm not the one that made the call to do that.
13    You'd have to talk to Lisa, to see if
14 she did it; I don't know.
15 Q. But you don't know why it was left.
16 A. It was left open so the water would go
17 where it went before.
18 Q. Well, why do you say that?
19 A. Because, if you patched over it, the water
20 would have run down the street, and changed the
21 historical drainage.
22 Q. And did somebody tell you that that gap
23 was left there by Mr. Imamura and Joe Costa's crew in
24 order not to alter the historic flow of surface water?
25 A. I don't remember if somebody told me that

**Page 171**

1 or not. I know that's why it was done is all I can
2 tell you.
3 Q. All right. And why do you believe that's
4 why it was done?
5     MR. SWOPE: Objection: Asked and
6 answered. We've beaten this to death, I think.
7     MR. SCOTT: Q. I'm just trying to
8 understand if you are speculating here that that's why
9 the gap was left there, or if you know from personal
10 knowledge that's why the gap was left there, since you
11 didn't do it.
12 A. I -- I -- Please -- Please ask that again.
13 Q. You declared that "the gap was left in
14 order not to alter the historic flow of surface water."
15 A. Okay.
16 Q. Okay. Although you testified here that
17 you don't know why Mr. Imamura and Mr. Costa decided to
18 stop paving in order to leave that gap --
19 A. No. No, I --
20     MR. SWOPE: Objection: That mistakes his
21 testimony.
22     THE WITNESS: Yeah.
23     MR. SCOTT: Q. Okay. Then, you do know
24 why they did it.
25 A. I told you, for historic drainage, it

**Page 172**

1 would not change it. I don't know who made the
2 decision to stop the asphalt where it was stopped. I
3 thought that's what you were asking me.
4 Q. Right. I am.
5 A. Okay; and I don't know who.
6 Q. Okay. But it wasn't your decision?
7 A. It was not mine, no.
8 Q. Was it your recommendation?
9 A. I didn't recommend it, no.
10 Q. To your knowledge, did anyone recommend
11 it?
12 A. Somebody must have, but I couldn't tell
13 you who.
14 Q. Who had the authority to make that
15 recommendation?
16 A. Mr. Imamura would be the Road Manager.
17 I'm sure he would be the one that could make that call.
18 Q. Would it be fair to say that in your
19 Declaration, at the top of page five, where you say:
20     "This gap was left in order not to alter
21     the historic flow of surface water
22     downhill to Plaintiffs' property,"
23 that that's an assumption you made? You are just
24 assuming that?
25 A. Well, that's -- From what I see, that's